DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CASE NO. 1:05 CR 153 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Memorandum Opinion |
| | ) | |
| Peter Zaky, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. Introduction

The defendant was sentenced on December 15, 2005, to a sentence of 30 months which followed the Court's determination that a variation upward from the advisory guideline sentencing range of 12 to 18 months, after consideration of the factors set forth in 18 U.S.C. § 3553(a) in the context of the teachings of *United States v. Booker,* 543 U.S., 125 S.Ct.738 (2005) was both appropriate and reasonable. The Court's analysis follows for the appellate review which will surely follow.

## II. A Review of the Section 3553 (a) Factors

**A. The nature and circumstances of the offense and the history and characteristics of the defendant.**

The defendant was charged with and pled guilty to a nine count indictment which charged five counts of wire fraud in violation of 18 U.S.C. §1343, two counts of mail fraud in violation of 18 U.S.C. § 1341, one count of misuse of Treasury Names or Symbols in violation of 31 U.S.C. § 333 and one count of a false statement in violation of 18 U.S.C. § 1001.

(1:05 CR 153)

The written plea agreement set forth the factual basis supporting the defendant's guilty pleas and stated as follows:

> Defendant, a resident of Parma, Ohio, states that in or about January 2000, he contacted Fanous Mikhail and Sanaa Mikhail, husband and wife, who live in southern California. Sanaa Mikhail is Defendant's cousin. The Mikhails earlier had invested money in one of Defendant's business projects. Defendant still owed them money. Defendant told the Mikhails he was in the process of purchasing an apartment building, the Garden West Apartments in Cleveland, Ohio, and represented to them would be a profitable investment. He solicited money from them to pay one-third of the down payment, representing that after the building was purchased, ownership would be transferred to a corporation he was forming, Brother's One, Inc. Defendant represented that the Mikhails would own one-third of the shares in Brother's One, Inc. and he would own two-thirds. A bank would finance the balance of the purchase price for the apartment building.
>
> From early 2000 until mid-2002, Defendant communicated numerous times with the Mikhails using telephone, e-mail and facsimile transmissions, reporting to them the progress allegedly made in purchasing the apartment building, ensuing problems with the building and representing he was transmitting documentation of the reported incorporation of Brother's One, Inc. The purpose of Defendant's communications with the Mikhails were to entice them to send money for the purchase of the apartment building. Defendant looked at the Garden West Apartments with realtor Regis Lee and told Lee he and a partner were interested in purchasing the apartments. Defendant later told Lee he was not interested. Defendant did not purchase the apartment building and did not form a corporation to hold title to the apartment building.
>
> As a result of Defendant's periodic solicitations, the Mikhails sent Defendant a total of $49,000 to invest in the apartment building. Various means were used to transmit the funds as requested by Defendant. On April 14, 2000, and May 1, 2000, two interstate interbank wire transfers of $15,000 each were made from the Mikhail's account at Cal Fed Bank in southern California to Defendant's account at Firstar in northern Ohio, through the Federal Reserve Bank in Cincinnati, Ohio. On or about August 21, 2000, and October 5, 2000, the Mikhails sent Defendant via the U.S. Mail, two personal checks in the amount of $5,000 and $10,000 respectively. Defendant deposited the two checks into his personal checking account. On May 11, 2001, and May 3, 2002, Fanous Mikhail made wire transfer of $2,000 each, via Western Union, which transfers were received by Defendant at a Western Union office in northern Ohio. Defendant

(1:05 CR 153)

>then deposited the funds received via Western Union into his personal checking account. Defendant used all the money sent to him by the Mikhails for his personal use and benefit.
>
>Among the false documents Defendant sent to the Mikhails by facsimile machine was a letter, telefaxed on April 3, 2002, and purportedly issued by the Department of the Treasury, Internal Revenue Service (IRS), on which was IRS's emblem. The letter represented that all Defendant's personal and business accounts had been seized in 2000 by the IRS. The letter was a fake, never issued by the IRS, sent by Defendant to alleviate the growing concerns of the Mikhails.
>
>Fanous Mikhail came to the Cleveland area in September 2003 to see about the apartment building investment and what happened to other monies earlier invested with Defendant. On September 24, 2003, Defendant signed a promissory note, promising to pay Fanous Mikhail, by December 24, 2003, the sum of $109,234, which was the total amount Defendant owed the Mikhails, including the $49,000 for the apartment building investment. Defendant did not pay off the obligation represented by the note.
>
>On November 1, 2004, agents from the United States Postal Inspection Service and the Department of the Treasury interviewed Defendant in connection with an ongoing investigation. The federal agents asked Defendant about the $109,234 promissory note. Defendant denied signing the note.

The defendant does not have a criminal record. He was born in Cairo, Egypt on November 1, 1948. He married his wife while still in Egypt in 1967. He and his wife have two children and his wife in planning to divorce the defendant. Their daughter described her father as a "physically abusive, adulterer who has led a double life for many years."

Although the defendant operated a dry cleaning business, he contended that he had no assets for payment of restitution. However, it developed during the several sentencing hearings that the defendant had placed monies under a power of attorney with a relative in Egypt.

During the pendency of the charges, the defendant shot himself while on bond and prior to the entry of a guilty plea on August 2, 2005.

3

(1:05 CR 153)

A summary of the messages sent by the defendant as a part of his fraudulent scheme is set forth in the presentence report as follows:

| DATE | SUMMARY OF MESSAGE |
|---|---|
| March 6, 2000 | Reports a meeting with the broker concerning heating and cooling system and building appraisal and that the broker scheduled a meting with owners for that evening. |
| March 7, 2000 | Reports the broker said he is still working with owners and has hired a certified appraiser who will view property on Friday. |
| April 7, 2000 | Reports that bank has confirmed receipt of the money investors has sent Peter Zaky. |
| April 27, 2000 | Reports the city has inspected the heating and cooling system and found it up to code, that the owners had paid $27,112, Peter Zaky has paid $5,000, no news from the bank, and requests the investors to transfer $15,000 as account is running low. |
| June 25, 2000 | Reports contact with the escrow company about the deed and projected closing date, that the attorney has completed the incorporation and is working on the leases. |
| August 21, 2000 | Asks the investors to transfer $5,000 more, to add to the $30,000 already received from them. |
| September 30, 2000 | Reports the bank has said it will not do anything until court documents received and that he has to start making interest payments. Peter Zaky states the down payment was $145,875, of which the investors' one-third share was $48,625 and that they still have to pay $13,625 and to send him $10,000 immediately. |

(1:05 CR 153)

| | |
|---|---|
| October 12, 2000 | Reports that Peter Zaky and his attorney had followed up with the escrow company, "all the papers are ready now" and they will issue a "clear deed 100%. Zaky also reports that his attorney has contacted the previous owners for the security deposit, which will be deposited in the corporate account as soon as the public notice for the corporation is filed in court. |
| October 24, 2000 | Reports the bank and escrow agent are having a dispute over interest payment, that the corporation is now legal and that the attorney and old owners have met to discuss leases and security deposits. Peter Zaky reports continued court activity to get the right to manage and operate the apartment building. |
| January 18, 2001 | Reports spending most of the day completing an inventory for the building with the realtor, attorney, and court guardian. Peter Zaky reports he and the accountant went to court to get a "final release for me to operate the building and release for the account to be transfer(d) from the court to our corporation account..." |
| May 4, 2001 | Reports a May 8 court appearance on lawsuit against the IRS. |
| May 8, 2001 | Reports trial involving the IRS and Attorney General did not go well and a second trial is scheduled for July 11. |
| May 11, 2001 | Identifies Western Union offices near the investors. |
| August 18, 2001 | Reports continued court activities and attorney's efforts to obtain a release of a list of all the evidence. |
| September 6, 2001 | Reports the IRS is working on all his personal and business records and no resolution of the federal court actions, "so I have no other choice now I have to wait." |

(1:05 CR 153)

| | | |
|---|---|---|
| February 27, 2002 | | Reports meeting with the Ohio Attorney General in an effort to secure the release of accounts. |
| April 3, 2002 | | Transmits by facsimile a copy of purported March 26, 2002 letter from the Internal Revenue Service to the taxpayer informing "To whom it May concern" that Peter Zaky and businesses, including Brother's One, Inc. have been "under legal investigation" by the IRS and Ohio Attorney General since October 2000. |
| May 3, 2002 | | Confirms receipt from investors of $2,000 at Western Union |
| July 27, 2002 | | Transmits by facsimile purported by the Ohio Department of Taxation certificate of corporation for Brother's One, Inc., affidavit of corporate agreement and by-laws of Brother's One, Inc., signed by Defendant Peter Zaky, and purportedly filed in the Cuyahoga County Court of Common Pleas. |

In conclusion, the defendant engaged in a series of criminal acts over an extended period of time to take from his victims, the Mikhails, extensive sums of money which have left the Mikhails near a state of destitution as indicated when they appeared at the first sentencing hearing on October 24, 2005.

### B.  The Need for the Sentence Imposed

**1.  To reflect the seriousness of the offense, promote respect for the law and provide punishment for the offense.**

The advisory guideline range of 12 to 18 months calls for a sentence that is patently insufficient to reflect the seriousness of the defendant's reprehensible conduct over a protracted period of time during which he played, without any sense of remorse, on the natural sympathies

6

(1:05 CR 153)

of his victims. A sentence of 18 months is insufficient to provide adequate punishment for the defendant's conduct.

### (2) To afford adequate deterrence to criminal conduct.

A sentence in excess of 18 months is, in the Court's view, necessary to provide adequate deterrence. The Court is of the view, and so finds, that the sentence of 30 months, as pronounced, does provide adequate deterrence.

### (3). To protect the public from further crimes of the defendant.

The Court is of the view that the defendant is without any sincere repentance for his conduct. His refusal to be forthcoming as to how he spent the monies taken from his victims, plus revelation that he has continued in a similar course of action with another victim, although on a lesser scale, suggests that he may engage in such conduct in the future. Thus, a longer sentence of 30 months will protect the public longer than a sentence of 18 months as provided under the advisory guideline calculation.

### (4) To provide the defendant with needed educational or vocational training, medical care or other correction treatment in the most effective manner

The defendant's physical condition is summarized in paragraphs 55 and 56 of the presentence report which state:

> Mr. Zaky reports a history of medical ailments dating back to approximately 1996. He described these ailments as back (diagnosed as moderate-degenerative changes with disc space narrowing in lower lumbar spine), kidney, circulation problems, along with an overactive thyroid. He has been treated by Dr. Thomas Murphy at Metrohealth Medical, Metrohealth Boulevard, Cleveland, Ohio, and Dr. Phillip Tomsik, 26300 Detroit Avenue, Rocky River, Ohio. Mr. Zaky claims he was previously prescribed Oxycodon, and Oxycontin

(1:05 CR 153)

> for pain (unverified). Medical records have been requested from these physicians.
>
> Many of the defendant records were forwarded to Northeast Correctional Facility in Youngstown, Ohio, where he is currently detained. Those records confirmed the defendant's medical history. In early August 2005, Mr. Zaky was removed from active suicide watch. As of August 1, 2005, the defendant was prescribed the following daily medications: Tapozole, 30 mg.; Sular, 20 mg.; Seroquel, 300 mg.; Pepcid, 20; Neurontin, 600 mg.; Lexapro 30 mg.; Celexa 60 mg.; Metroprolol 50 mg.; Coumadin, 3 mg.; and Tylenol, 500 mg. (verified).

The Court is of the view that the defendant will probably receive better medical treatment while incarcerated. His eventual release from incarceration will probably present a bleak picture. Possibly the defendant can use his period of incarceration to improve his health and his mental posture and prepare him for a release back into society.

### III. Conclusion

After considering the advisory guideline sentencing range and analysis of the factors set forth in 18 U.S.C. § 3553 (a), the Court concluded that it should engage in a variation and increase the offense level by four levels, after finding that an increase of less than four levels did not provide a reasonable basis for an increased sentence. By such an increase, the Court increased the number of months available for a sentence for the defendant's conduct by 12

8

(1:05 CR 153)

months. The Court is of the belief that such an increase is, under the circumstances of this case, a reasonable sentence in the context of the teachings of *Booker*.

 The clerk is directed to file this opinion and attach a copy to the sentencing order.

 IT IS SO ORDERED.


|  December 16, 2005  |  */s/ David D. Dowd, Jr.*  |
|---|---|
| Date | David D. Dowd, Jr. |
| | U.S. District Judge |